STATE OF CONNECTICUT *v.*
DANIEL W. HAMLETT, SR.
(AC 27601)

Argued November 26, 2007—officially released February 19, 2008

*Mary H. Trainer*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Daniel W. Hamlett, Sr., appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree as an accessory in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8 (a).[1] On appeal, the defendant claims that the trial court (1) incorrectly denied his motion for a judgment of acquittal because there was insufficient evidence to find him liable as an accessory, (2) abused its discretion when it declined to order a mistrial and (3) improperly overruled his objection to the state's exercise of a

---

[1] The defendant was found not guilty of the offenses of unlawful discharge of a firearm, pursuant to General Statutes § 53a-203, criminal possession of a pistol or revolver without a permit, pursuant to General Statutes § 53a-217, and carrying a pistol or revolver without a permit, pursuant to General Statutes § 29-35. These charges originated from an alleged second encounter between the victim and the defendant at a convenience store in December, 2002, during which the defendant allegedly fired a gun into the air.

peremptory challenge. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of August 14, 2003, the victim, Jeffrey Baker, arrived at a club in New Haven to meet a woman who identified herself as Ayeesha. After the club closed, the victim and Ayeesha met at an Exxon gasoline station. From there, the victim and Ayeesha drove separately to Ayesha's house at 191 Wolcott Street in the Fairhaven section of New Haven. Upon arrival at the house, they encountered the defendant, a man the victim knew as Bo because they had been previously incarcerated together. The defendant informed the victim that Ayeesha was his cousin and asked the victim to look out for her. According to the victim, this brief conversation was not at all hostile.

Afterward, the victim and Ayeesha went into the house and to Ayeesha's bedroom where they kissed and touched each other while remaining fully clothed. At some point in the early morning hours of August 15, the victim decided to leave. He drove his car to a nearby convenience store where he realized that the money in his pants pocket was missing. Believing that Ayeesha took the money, the victim drove back to her house to retrieve it. He unsuccessfully tried to get Ayeesha's attention by repeatedly ringing the door bell, banging on the door and tapping the window.

While the victim was trying to rouse Ayeesha, the defendant and another man approached the victim in front of the house. The victim informed the defendant that Ayeesha had taken his money. When the defendant denied the victim's accusation, an argument ensued. At this point, both the defendant and the other man drew their guns. The victim raised his hands but continued to argue until he heard a gunshot and felt his left hand start to burn. He clutched his hand and ran away down

the street. At the corner, he called his girlfriend and, shortly thereafter, was transported to a hospital by emergency medical personnel who treated him for a gunshot wound in his left hand and a second wound in his thigh.

At the hospital, immediately after the shooting, the victim claimed that he could not identify or describe the shooter. Detective Reginald Sutton of the New Haven police department, a witness for the defense, testified, however, that six days after the shooting, the victim went to the police and informed them that he recognized one of the gunmen as "Bo Rock" but that it was the other man who had shot him. At trial, the victim testified that he saw the defendant shoot him and that the bullet wounds were to the left side of his body, which was the side of his body where the defendant was standing. The victim explained that his initial refusal to talk to the police was due to the fact that as a former gang member, he believed that "we didn't get the cops involved in our situations. We basically handle it all ourselves."

The defendant was convicted of assault in the first degree as an accessory and sentenced to the custody of the commissioner of correction for eleven years, with five years special parole.[2] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims on appeal that the court incorrectly denied his motion for acquittal. Specifically, the defendant claims that the evidence presented at trial proved beyond a reasonable doubt that he was the

[2] At the sentencing proceeding, the defendant stipulated to the fact that he had violated his probation from a previous conviction. For that violation, the court ordered him to serve the remaining portion of the sentence imposed in that case, approximately four years, consecutively to the sentence imposed for the first degree assault in the present case.

principal shooter, and, therefore, he could not be convicted as an accessory. We are unpersuaded.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict." (Internal quotation marks omitted.) *State* v. *Hines*, 89 Conn. App. 440, 446, 873 A.2d 1042, cert. denied, 275 Conn. 904, 882 A.2d 678 (2005). It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. "We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . . the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Smith*, 212 Conn. 593, 599, 563 A.2d 671 (1989).

To sustain a conviction under General Statutes § 53a-59 (a) (5), the state must prove beyond a reasonable doubt that the defendant (1) intended to cause physical injury to another person, (2) caused such injury to such person or to a third person and (3) did so by means of the discharge of a firearm. *State* v. *Salaman*, 97 Conn. App. 670, 676 n.5, 905 A.2d 739, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006). In the present case, because

the defendant was charged as an accessory, the state did not have to prove that the defendant actually caused physical injury to the victim. See General Statutes § 53a-8 (a).

Under General Statutes § 53a-8 (a), a person may be prosecuted as if he were the principal offender when, "acting with the mental state required for commission of an offense, [he] solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." It is well settled that "under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Internal quotation marks omitted.) *State* v. *Hines*, supra, 89 Conn. App. 447.

The defendant admits that the evidence in the state's case proves beyond a reasonable doubt that he was the principal shooter. Correspondingly, because, in the defendant's view, the evidence established that he was the principal, the defendant contends that he cannot be found guilty as a mere accessory.

In reviewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to convict the defendant of assault in the first degree as an accessory or as the principal. The evidence adduced at trial revealed that the defendant and another man approached the victim together while he was outside of Ayeesha's house. During the ensuing argument, both men confronted the victim with guns. The victim suffered gunshot wounds in the hand and thigh. Detective Sutton testified that, at the hospital,

the victim could not identify his attackers, but six days later, he stated that it was the other man, not the man he recognized as "Bo Rock," who had shot him.[3] At trial, however, the victim testified that it was the defendant who had shot him.

The jury was presented with ample evidence to find beyond a reasonable doubt that either the defendant or his cohort intentionally shot the victim. Given the conflicting statements of the victim and the inconclusiveness of the physical evidence, it is reasonable that the jury was unable to determine which man actually had fired his gun. See, e.g., *State* v. *Hines,* supra, 89 Conn. App. 450–51 (upholding denial of motion for acquittal for insufficient evidence and stating that "[a]lthough the evidence may not have revealed whether it was the defendant or the second shooter who fired the gunshot that injured [the victim], the jury reasonably could have determined that there was sufficient concert of action between the defendant and the second shooter to convict the defendant as an accessory").

In addition to failing to establish any factual insufficiency for his conviction of accessory liability, the defendant also fails to illustrate that there is any relevant distinction between accessory and principal liability. "Connecticut long ago adopted the rule that there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining

---

[3] The defendant claims that Sutton's testimony that the victim's statement, made six days after the shooting, identifying the other man as the shooter, was admissible only for impeachment purposes and not as substantive evidence. During the postevidence motion for acquittal hearing, the court mistakenly agreed that the statement was offered only for credibility purposes. "Absent a limiting instruction, evidence presented at trial is taken for its truth." (Internal quotation marks omitted.) *State* v. *Cramer,* 57 Conn. App. 452, 455, 749 A.2d 60, cert. denied, 253 Conn. 924, 754 A.2d 797 (2000). Because no limiting instruction was ever given, the evidence was fully admitted for the jury to weigh in accordance with the court's general instructions regarding trial evidence.

criminal responsibility. . . . The modern approach is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . Connecticut has taken the same approach through General Statutes § 53a-8." (Citations omitted; internal quotation marks omitted.) *State* v. *Foster*, 202 Conn. 520, 532–33, 522 A.2d 277 (1987). There is no meaningful distinction between principal and accessory liability; they are simply theories for proving criminal liability. Given that a defendant may be convicted as an accessory even though he was charged only as a principal; see *State* v. *Smith*, supra, 212 Conn. 606; we reject his argument that evidence sufficient to convict a defendant as a principal would be insufficient for a conviction under the theory of accessory liability.

## II

The defendant next claims that the court abused its discretion and failed to provide an adequate remedy to cure the state's failure to disclose Detective Sutton's field notes during discovery. Specifically, the defendant claims that the court should have granted his motion for a mistrial or, in the alternative, completely precluded the state from referencing the field notes in its cross-examination. We conclude that the court did not abuse its discretion and acted properly.

The following additional facts are relevant to the defendant's claim. Sutton first testified when called by the defendant in the defendant's case-in-chief. Part of Sutton's testimony focused on statements made by the victim six days after the shooting that Sutton memorialized in a police report he wrote seventeen days later on September 7, 2003. On direct examination, Sutton testified that the victim told him that, on the night of the shooting, he had met a girl at the Cardinal club

before going to 191 Wolcott Street with her for about three hours, that upon leaving her house he was confronted by two men who pointed guns at him that looked like "mini-rifles" and that he was shot by the man who was with "Bo Rock." During direct examination, although the police report was used to refresh Sutton's recollection, it was not entered into evidence.

On cross-examination, Sutton testified that he took notes during his interview with the victim one week after the shooting. The state then confronted him with a copy of these field notes. At that point, the defense objected to testimony regarding the field notes on the ground that they had not been previously disclosed. In the absence of the jury, the defense claimed that the state had acted in contravention of an internal memo from the chief state's attorney that all field notes used to draft police reports are discoverable. The defense pronounced the state's behavior both "underhanded and sneaky" because the prosecutor had waited until after the defense had conducted its direct examination of Sutton, in which the defense focused its questioning on discrepancies between the report and the victim's testimony, to reveal the field notes. In particular, the defense was upset because it had used the police report to attack the credibility of the victim's testimony that he had met Ayeesha at the Taurus club. The police report indicated that the victim had reported that they had met at the Cardinal club. The field notes, however, reveal that the victim told Sutton that they had met at the Taurus club all along and made no mention of the Cardinal club.[4] The state responded that because there

---

[4] The field notes revealed a number of other inconsistencies between the police report and the field notes:

(1) the field notes described the woman that the victim met and identified her as "Iesha" while the report names her "Kesha" of "Kenesha";

(2) the field notes refer to someone named "Bo" whereas the report refers to someone called "Bo (or Boe) Rock";

(3) the field notes and the report differ on the amount of time the victim spent with the woman at 191 Wolcott Street;

was nothing exculpatory in the notes, and Sutton was not the state's witness, it was not required to disclose them.

The court responded: "The notes should have been disclosed. Quite frankly, I don't think it's a close question that the notes should have been disclosed."[5] The court continued: "It's fair to say that the defense did make certain tactical decisions based on the state of the facts as they understood them, which did not include these notes. On the other hand, I don't see this as a sort of issue that prevents the fundamental fairness of the trial, so the motion for mistrial is denied." As an alternative to declaring a mistrial or excluding the field notes altogether, the court remedied the state's violation by prohibiting further mention of the Taurus-Cardinal club discrepancy. The court permitted the state to use the field notes to question Sutton about other discrepancies between the field notes and the police report.

---

(4) the report indicates that the victim's wallet was stolen, but the field notes do not mention a wallet;

(5) the field notes state that the victim's money was stolen from his cargo pants while "they were feeling around with each other on the bed," but the report does not mention this;

(6) the report indicates that the victim told his girlfriend he was going out with someone named "Bo," but the field notes do not make any mention of this;

(7) the field notes say that Bo "wasn't trying to hear his complaint" while the report states that Bo Rock called him a liar;

(8) the field notes called the guns "baby rifles" in contrast to the report's mention of "mini rifles";

(9) the report indicates that the victim did not want to pursue the matter because he "didn't want this drama in my life" while the field notes do not mention this; and

(10) the field notes indicate that the victim called 911 while he was running away, but the report does not state this.

[5] The court explained its reasoning for finding that the state should have disclosed the field notes to the defense off the record, in chambers. It is apparent, from the record, however, that the decision was based on the state's violation of the Practice Book § 40-11, which describes the materials that are discoverable by a criminal defendant.

On appeal, the defendant claims that the court abused its discretion because the state's failure to turn over the field notes was sufficiently egregious to merit a mistrial. Specifically, the defendant claims that his strategy of impeaching the credibility of the victim through the police report was undermined by the state's failure to disclose and subsequent revelation of the field notes because the field notes revealed that purported discrepancies in the victim's testimony were, in fact, merely transcription errors made by Sutton. Therefore, the defendant argues, because the state's failure to disclose the field notes significantly damaged his planned defense, a mistrial was warranted.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006). "In [its] review of the denial of a motion for mistrial, [our Supreme Court has] recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sewell*, 95 Conn. App. 815, 818, 898 A.2d 828, cert. denied, 280

Conn. 905, 907 A.2d 94 (2006). "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 658, 899 A.2d 1 (2006).

Additionally, "Practice Book § 40-5 gives broad discretion to the trial judge to fashion an appropriate remedy for non-compliance with discovery. . . . Generally, [t]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Sewell*, supra, 95 Conn. App. 818–19.

We conclude that the court did not abuse its discretion by denying the defendant's motion for a mistrial on the basis of the state's failure to provide the field notes on which Sutton's police report was based. Although the field notes reveal that the police report was an inaccurate representation of the statements the victim made to Sutton six days after the shooting, we agree with the trial court that a mistrial was not a mandated remedy. The court engaged in the appropriate analysis. It questioned the state as to why the field notes were not disclosed; it examined the extent to which

the defendant relied on the police report to discredit the victim's testimony; and it weighed the feasibility of various options in determining the appropriate remedy for the state's violation. Though the defense's strategy of discrediting the victim's testimony through the police report was affected by the emergence of the field notes, the victim's identification of the other man as the shooter is reflected in both the field notes and the subsequent report. Furthermore, the court prevented further mention of the Taurus-Cardinal club discrepancy, leaving the jury with the ability to determine that the victim was inconsistent about this detail. The other discrepancies between the field notes and the police report were relatively minor and do not persuade us that the court abused its discretion in denying the defendant's motion for a mistrial.

We also disagree with the defendant's argument that, in the alternative, the court abused its discretion in refusing to remedy the state's violation with complete exclusion of the field notes. Even when the state has committed a discovery violation, "[s]uppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). Because the court provided an appropriate remedy, we do not believe that its denial of the defendant's proposed remedy of excluding the field notes altogether was an abuse of discretion.

### III

The defendant's final claim is that the court improperly denied his *Batson*[6] objection to the state's peremptory challenge of an African-American venireperson. We are unpersuaded.

---

[6] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The following additional facts are undisputed. On October 13, 2004, M,[7] a male African-American venireperson, was questioned by both the state and the defendant through voir dire. Through this process, M revealed that he had achieved sobriety through a yearlong "Christian discipline program" in Pennsylvania for "people who've struggled with drug and alcohol, substance abuse." M explained that after twenty-five years of alcohol and drug abuse, this program had helped him to be sober for the previous eighteen months. The prosecutor continued questioning M about the state's burden of proof and M's general opinion of police officers and then returned to the topic of M's sobriety to ask whether his participation in the yearlong program might incline him to be more forgiving or sympathetic than objective toward the defendant. M opined that he would not have a problem being objective.

After voir dire was complete, the prosecutor exercised a peremptory challenge with respect to M. When counsel for the defense requested that the state articulate a reason for the challenge, the state replied: "The reason is [that] twenty-five years of substance abuse just leaves too many questions about his reaction to almost everything for me to take a chance at this point with as many challenges as I have." Unsatisfied with this explanation, the defense challenged the state's articulated reason. Taking this as a claim that the state's explanation was pretextual, the prosecutor responded: "The fact is that [M] has a very unusual background, we're in a criminal case, I don't know what he has been taught. [Defense counsel] apparently knows more about the kinds of things that he has been subjected to, but it was obviously something very powerful that brought

---

[7] We refer to the venireperson by his initial to protect his legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

him back from twenty-five years of addiction, and without knowing what it is, I don't know what his world view is going to be based upon that. He has gone through some kind of major transformation in the last year, I don't know what it is and I don't think it's appropriate for me to ask a million questions to try to find that out. He's a juror who is—who is a very different kind of person than who we've seen before, and I don't need to take the chance that that would be bad for me." Defense counsel retorted that the two African-American jurors already seated on the jury were "both college graduates" and "[master of business administration] candidates," and that the state should "not pretend that these are black people from the community." The state maintained that it had provided an appropriate reason for exercising its peremptory challenge. After hearing the parties, the court ruled: "On the full record of this case, I find that the reason is a race neutral reason. I'm going to permit the exercise of the peremptory challenge."

"In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)], the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . .

The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue

of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State v. Monroe*, 98 Conn. App. 588, 590–92, 910 A.2d 229 (2006), cert. denied, 281 Conn. 909, 916 A.2d 53 (2007).

In the present case, after counsel for the defense asserted his *Batson* claim against the state's peremptory challenge, the state responded that the venireperson was potentially unpredictable because of his recent transformative experience that helped him to end twenty-five years of substance abuse. We agree with the court that the state's explanation was race neutral. Thereafter, the burden of persuasion rested on the defense to demonstrate to the court that the state purposefully discriminated against this potential juror.

Defense counsel argues that the state should have accepted M's assurances that his objective judgment

would not be clouded by the lessons of forgiveness espoused by the substance abuse program he attended. We disagree. "[A] prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). We cannot say, in light of M's entire voir dire examination, that the prosecutor's stated concern that the defendant might disregard objective facts in favor of feelings of forgiveness was a pretext for excusing M for a prohibited reason.

We also find meritless the defendant's argument that the prosecutor's articulated reason for the peremptory challenge was pretextual because the other two previously selected African-American members of the jury were highly educated and, therefore, were not representatives of the community. Indeed, this argument appears to advance the same race-based stereotypes that *Batson* was designed to eliminate from jury selection.

We conclude that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous. "[T]he fact-bound determination concerning the propriety of the use of peremptory challenges is a matter that necessarily must be entrusted to the sound judgment of the trial court, which, unlike an appellate court, can observe the attorney and the venireperson and assess the attorney's proffered reasons in light of all the relevant circumstances." Id., 261. Here, the court determined that the reasons offered by the prosecutor for striking M were race neutral, supported by the record and not pretextual. See *State* v. *Monroe*, supra, 98 Conn. App. 596. The court properly determined that the state had not exercised its peremptory challenge in a racially discriminatory manner.

The judgment is affirmed.

In this opinion the other judges concurred.