STATE OF CONNECTICUT *v.* NAZRA MUNGROO
(AC 28424)

McLachlan, Lavine and Beach, Js.

Argued September 23—officially released December 23, 2008

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom were *Gail P. Hardy*, state's attorney, and *Michael J. Sullivan*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Nazra Mungroo, appeals from the judgment of conviction, rendered after a jury trial, of fraudulent receipt of workers' compensation benefits in violation of General Statutes § 31-290c (a) (2). On appeal, the defendant claims that the trial court improperly (1) denied her motion for a judgment of acquittal in which she claimed that there was insufficient evidence that she had failed to disclose a material fact in her claim for workers' compensation benefits, (2) denied her motion for a mistrial founded on testimony that she had invoked her right to counsel and (3) instructed the jury. We affirm the judgment of the trial court.

A detailed recitation of undisputed facts is necessary to place the issues in context. In March, 2002, the defendant was employed as the general cashier and income auditor for the Hilton Hotel in Hartford (hotel). In the early morning hours of March 4, 2002, the hotel was robbed of tens of thousands of dollars in cash and checks stored in the hotel's main safe. The defendant reported the robbery and was taken to Hartford Hospital, complaining of diabetes related symptoms. The

defendant was absent from her employment for a couple of days but carried out her responsibilities on March 7 and 8, 2002. She then took sick leave until May 20, 2002. She received workers' compensation benefits in excess of $5000.

The defendant was arrested in the spring of 2005 and charged with workers' compensation fraud. Just prior to trial in October, 2006, the state filed a long form information alleging that the defendant (1) intentionally and falsely made a claim for workers' compensation benefits and (2) intentionally misrepresented and failed to disclose the true circumstances existing at the time of her alleged injury in violation of § 31-290c (a) (1) and (2). Before the case was submitted to the jury, the state filed an amended long form information alleging only a violation of § 31-290c (a) (2). The jury found the defendant guilty, and the court sentenced her to one year of incarceration consecutive to the sentence the defendant was then serving for her conviction related to her role in the robbery.[1]

On the basis of the evidence presented, the jury reasonably could have found the following facts. As the general cashier and income auditor for the hotel, the defendant's primary responsibility was to prepare money collected by the hotel for deposit in a bank. The defendant also maintained the income journal. The daily deposits were kept in separate bags and stored in the hotel's main safe along with the ledger. Brinks Armored Car Service (Brinks) called for the bags each day during

---

[1] The defendant was convicted of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2) and falsely reporting an incident in the second degree in violation of General Statutes § 53a-180c (a) (3) for participating in a staged robbery at the hotel on March 4, 2002. See *State v. Mungroo*, 104 Conn. App. 668, 935 A.2d 229 (2007) (reversed only as to sentence for falsely reporting incident in second degree and remanded for resentencing), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008). This court may take judicial notice of the file in another case. *Karp v. Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 623 (1972).

the work week and transferred them to a bank where the money was deposited. When the defendant turned a deposit over to Brinks, the Brinks employee and the defendant signed the ledger to document the date, time and amount of the deposit. The defendant was the only person authorized to make deposits.

The hotel's main safe was located in a first floor room adjacent to the cash room, a section of the hotel limited to employees. To gain entry to the cash room, a person had to enter a code to open the door. One could also enter the cash room by taking the service elevator to the area. The service elevator was accessible through an unlocked door on any floor of the hotel. Anyone using the service elevator would be observed by a security camera at the door of the safe room. The defendant prepared the deposit bags in the cash room and stored them in the safe until Brinks called for them. She was the only hotel employee who knew the combination to the safe.

Although the defendant generally performed her responsibilities during the daytime, she had volunteered to work on the evening of Sunday, March 3, 2002, to train the new night auditor. She began her shift at 10 p.m. She also had worked the evening shift on several Sundays immediately prior to March 3, 2002. At the time of the robbery, Susan Ridgeway, the general manager, was returning to the hotel from her home in Pennsylvania where she routinely spent weekends. Rupert Bennett, controller and the defendant's immediate supervisor, whose responsibilities included verifying the hotel's bank deposits online, had been on vacation during the two weeks preceding the robbery. Ridgeway and Bennett each knew one half of the combination to the main safe.

At approximately 8 a.m. on March 4, 2002, Michael Lopez, a detective assigned to the major crime division

of the Hartford police department, was dispatched to the hotel to investigate a robbery that reportedly had occurred at 4:45 a.m. that day. The defendant was the reported victim of the robbery. Lopez interviewed the defendant at Hartford Hospital where she had been taken after the robbery because she was complaining of diabetes related symptoms. Lopez asked the defendant if she had been injured during the robbery. The defendant responded that she had not been injured, and Lopez observed no injuries.

When she spoke to Lopez at the hospital, the defendant reported that at approximately 4:34 a.m., she was on her way to the cash room when a hotel employee approached her and asked her to make change.[2] She also was approached by a masked black man, six feet tall, dressed in dark clothing, who placed what she thought was a gun against her back and ordered her to open the safe. The safe, however, was open, and the perpetrator took cash, checks, the ledger and a bank bag and fled. According to the defendant, the safe was open at the time because she was preparing the weekend deposits for pickup.

Gordon Johnson was the only security guard on duty at the hotel that night. According to Johnson, he was sitting in the lobby at approximately 4 a.m. When he got up to return to the security office, the defendant asked him where he was going. Johnson did not recall the defendant's ever having asked him that question before. Approximately ten minutes later, the defendant called Johnson on the radio to report that the hotel had been robbed at gunpoint. Johnson immediately returned to the lobby of the hotel and instructed another employee to call 911.

Initially, the defendant told Ridgeway that at the time of the robbery, the safe contained deposits only from

---

[2] Lopez spoke to the employee, who was unable to verify the event.

the weekend of March 1 through 3, 2002. Ridgeway reviewed the hotel's bank records and determined that the last bank deposit receipt was dated February 19, 2002. Deposits for eleven days had not been transferred to Brinks for deposit and were missing. The total loss to the hotel was $104,718.18. The defendant later told Ridgeway and Lopez that she had received a telephone call from someone she could identify only as an Hispanic male from Brinks, who indicated that the missing deposits had been located and would be deposited immediately. The deposits, however, were never made to the hotel's account. On April 3, 2002, the defendant told Lopez that the deposits for February 20 through 25, 2002, could have been in the safe at the time of the robbery and that she may not have given Brinks the deposit slips because her numerous other responsibilities may have prevented her from doing so.

Only one of the security cameras operating in the hotel on March 4, 2002, recorded the perpetrator. That security camera was located at the door to the safe room. The only way the perpetrator could have eluded other security cameras in the hotel was to enter the cash room via the service elevator to the first floor.[3] The security camera at the door to the safe room recorded the defendant and the perpetrator. The perpetrator appeared to be pointing something, concealed under his or her clothing, at the defendant. The defendant and the perpetrator were recorded entering the safe room at 4:34 a.m. and exiting it at 4:39 a.m. The security film does not depict a physical altercation between the defendant and the perpetrator. After the perpetrator fled, the individual was not seen in other surveyed areas of the hotel.

On June 10, 2002, Ernest Gonzalez, a member of the hotel maintenance staff, found a bank bag containing

---

[3] The location of the service elevator is known to hotel employees.

several torn checks and a Brinks ledger in room 424 when he moved the furniture to give the carpet a thorough cleaning. The items were turned over to Glenn Peruta, manager of hotel security, who gave them to Ridgeway. Ridgeway then reviewed all of the records pertaining to room 424 for March 3 and 4, 2002.

The hotel's computer generated key system indicated that a key for room 424 had been made[4] by the defendant on March 3, 2002, at 10:20 p.m. The hotel also had a computer generated historical record of transactions for room 424 from March 3 through March 5, 2002. The record revealed that the defendant checked a guest into room 424 at 10:56 p.m. on March 3, 2002, thirty-six minutes after the key was made. Generally, a guest must register before a room key is made. At 1:43 p.m. on March 4, 2002, another hotel employee, Nadine Jennings, changed the rate for room 424 from complimentary,[5] which was coded in at the time of check in, to $106. The rate was changed twice more. On the evening of March 4, 2002, the guest's departure date was changed from March 4 to March 5, 2002. The guest checked out of room 424 at 4:23 p.m. on March 5, 2002.

Ridgeway also reviewed the registration card for room 424 and examined the signature. The name on the top of the card was "Wagner, Lawrence," but the card was signed William Lawrence. Ridgeway recognized Wagner as the name of one of the hotel's frequent guests. He was an out-of-state employee of an insurance company, whose offices were across the street from the hotel. Wagner had stayed in the hotel ninety-seven times within the year prior to the robbery. Wagner never

---

[4] The hotel room keys are cards with magnetic strips programmed in a card reader. The security code of the person making the key is entered into the reader, as are the room number, the number of keys made and the duration of the guest's stay.

[5] A complimentary rate meant that there was no charge for the room. The decision to offer a complimentary rate is made by hotel management.

stayed in a hotel room below the fourteenth floor,[6] and he had never checked into the hotel on a Sunday or a Monday.

The defendant's physician, Scott Bernstein, saw the defendant in his office on March 5, 2002, at which time she was complaining of anxiety, fatigue and a sore throat. Bernstein reviewed the defendant's emergency room record and noted that medication for stress and anxiety had been prescribed for her. When Bernstein saw the defendant on March 8, 2002, she was in emotional distress, experiencing anxiety, insomnia and muscle spasms in the back of her neck, shoulders and trapezius muscle. Bernstein referred the defendant to a psychiatrist, Gerald Selzer. Because the defendant was having chest, back and shoulder pain, Bernstein referred the defendant for physical therapy on March 26, 2002. Bernstein next saw the defendant on May 22, 2002, at which time she had concluded physical therapy but was taking muscle relaxants and psychiatric medication.

On June 10, 2002, Ridgeway informed Lopez that the bank bags had been discovered in room 424. That day, Lopez and another police officer went unannounced to the defendant's home in Hartford to speak with her.[7] At that time, the defendant told Lopez that because the front desk was very busy on March 3, 2002, she assisted and rented room 424 to someone. The defendant also told Lopez that at 3 a.m. on March 4, 2002, the guest who rented room 424 called her and asked to extend the stay. Subsequent to that conversation with the defendant, Lopez reviewed the security video of the front desk for the date in question and observed that the desk was not busy. Moreover, Lopez learned that

---

[6] Ridgeway testified that commonly, for various reasons, hotel guests will not stay on particular floors.

[7] On prior occasions, the defendant failed to keep appointments to meet with Lopez.

it was not the defendant's primary responsibility to sign in guests.

In 2005, the defendant was arrested and charged with violation of § 31-290c (a) (1) and (2). Amy-Sue Munroe, an employee of the workers' compensation commission, testified at trial. Munroe controls files and records for workers' compensation claims. Those records include a numbered file for the defendant, indicating that she made a workers' compensation claim arising from an incident at the hotel on March 4, 2002, and that she received benefits. The file contains medical reports from Hartford Hospital, Bernstein and Selzer.

Robert McCarthy was the Kemper Insurance Company claims representative assigned to investigate and process the defendant's claim. In the course of processing the defendant's claim, McCarthy took a statement from the defendant and subsequently recommended that the claim be rejected. The workers' compensation commissioner, however, informally recommended that the claim be paid.[8] The defendant received $472.96 in medical and $5263.61 in indemnity benefits.[9]

Richard Owens, program manager of the insurance fraud unit of the insurance department, testified. He is responsible for receiving and reviewing complaints of insurance fraud and referring them to federal or state authorities, if appropriate. He received a complaint from Broadspire Services,[10] regarding the defendant, on August 11, 2004. After reviewing the file, Owens

[8] A request for a formal workers' compensation hearing was made but later withdrawn.

[9] Copies of cancelled benefit checks paid to the defendant were entered into evidence.

[10] Kemper Insurance Company sold its claims operation in July, 2003. Broadspire Services was set up as a stand-alone third party claims administrator for Kemper Insurance Company.

forwarded the file to the office of the chief state's attorney, workers' compensation fraud control unit. Additional facts will be addressed as necessary.

## I

The defendant's first claim is that the court improperly denied her motion for a judgment of acquittal because there was insufficient evidence that she failed to disclose material facts about the injury for which she submitted a claim for workers' compensation benefits. Specifically, the defendant claims that the evidence was insufficient because the state failed to place her written claim for workers' compensation benefits into evidence, and the jury had to speculate as to whether she omitted material facts. We disagree.

Following the presentation of the evidence, the defendant filed a motion for a judgment of acquittal pursuant to Practice Book § 42-42. In support of her motion, defense counsel noted three elements of § 31-290c (a)[11] that the state had to prove: (1) the defendant made a claim; (2) the claim was based in whole or in part on an intentional misrepresentation of a material fact; and (3) the value of the benefits received was greater than $5000. Defense counsel argued that there was no evidence as to the defendant's claim for workers' compensation benefits, as the defendant's claim form had not been put into evidence. Without seeing the claim form or her statement as to why she was claiming benefits, defense counsel argued that the jury could not evaluate

---

[11] General Statutes § 31-290c (a) provides in relevant part: "Any person . . . who makes . . . any claim for benefits, receives . . . benefits . . . under this chapter based in whole or in part upon (1) the intentional misrepresentation of any material fact including, but not limited to, the existence, time, date, place, location, circumstances or symptoms of the claimed injury or illness or (2) the intentional nondisclosure of any material fact affecting such claim . . . shall be guilty of a class B felony if the amount of such benefits exceeds two thousand dollars. . . ."

whether there had been a misrepresentation or an omission.

In response, the state recited the evidence for the court, specifically that the defendant had submitted a claim, that she had received benefits and that her claim was investigated for insurance fraud. The state emphasized that a claim cannot be based on a misrepresentation of material fact. In answer to the court's inquiry as to what the state was alleging the defendant had misrepresented when she filed her workers' compensation claim, the prosecutor stated that the defendant misrepresented that she (1) was acting in her capacity as a hotel employee with respect to the robbery and (2) was injured. The defendant also failed to state that she helped stage the robbery.

In analyzing the issues, the court first referred to the difference between the subdivisions of § 31-290c (a): subdivision (1) requires the intentional *misrepresentation* of a material fact, and subdivision (2) requires the intentional *nondisclosure* of a material fact. See footnote 11. Second, the court reviewed the long form information dated October 6, 2006, in which the state alleged that the defendant "failed to disclose the true circumstances existing of the alleged injury arising out of the course of a staged robbery." Noting that nondisclosure requires no statement of facts, the court reasoned: "If [the defendant] didn't put in that the robbery was a phony, that's nondisclosure of material fact." Defense counsel agreed with the court's reasoning but countered that no one knew what she claimed or when. The state offered that the evidence demonstrated that the defendant had received workers' compensation benefits before it was known that she was involved in the robbery. The court concluded that there was enough evidence to submit to the jury that the robbery was

staged but that there was no evidence that the defendant's claim form contained a material misrepresentation.

On October 31, 2006, the state filed an amended long form information, alleging, in part, that "[o]n or about March 4, 2002 and on diverse days thereafter in the [c]ity of Hartford . . . the defendant . . . intentionally failed to disclose material facts regarding the true circumstances existing at said time and place of her alleged injury arising in and out of the course of a staged robbery of the Hilton Hotel, resulting in the loss of $38,424.00 in U.S. Currency and $66,294.12 in checks, payable to the Hilton Hotel. The defendant . . . thereby intentionally and wrongfully received in excess of $5000 in workers' compensation benefits to which she was not entitled, all in violation of § 31-290c (a) (2) . . . ."[12]

The theory of the state's closing argument to the jury was that "the defendant failed to disclose certain important material information that would affect her right to claim workers' compensation benefits," namely, that she failed to disclose the truth concerning the circumstances of the robbery, specifically, that she was a willing participant and that she was not injured. Defense counsel argued that without seeing the defendant's claim form, the jury could not know what she had claimed or had failed to claim.

In its charge to the jury, the court instructed on, among other things, circumstantial evidence, intent, inference and the elements of the charged crime, including the definitions of intentional nondisclosure, knowingly and material fact.[13] The jury found the defendant guilty of fraudulent receipt of workers' compensation benefits for failing to disclose a material fact in violation

---

[12] The jury had a copy of the amended information during its deliberations.

[13] The defendant did not take an exception to the charge that was given.

of § 31-290c (a) (2). The defendant renewed her motion for a judgment of acquittal prior to sentencing, arguing that the jury had to speculate as to what she had claimed or withheld. The court denied the motion on December 14, 2006, concluding that the jury did not have to speculate to reach a verdict.[14]

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury [reasonably could have] concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a

---

[14] The following colloquy transpired between defense counsel and the court:

"[Defense Counsel]: I'm talking about a claim to the employer. The statute's based on the claim to the employer that's based upon fraud. We don't have sufficient evidence of what exactly, what was that claim, and, therefore, the jury has to speculate as to what was claimed or what was withheld. And you can't speculate. The state has to establish that.

"The Court: I understand that juries are not supposed to speculate, but is it speculation that she withheld the fact that this was a staged robbery?

"[Defense Counsel]: Yes. We don't know the circumstances she claimed the injury occurred in or what the injury was.

"The Court: If you write to the [workers'] compensation commission and say I staged a robbery at the hotel, I took $114,000 worth of money and checks and credit card slips or whatever they use there, and I got hurt during a robbery that I conspired to create and participate in, and falsify, they're still going to give you [compensation]?

"[Defense Counsel]: I wouldn't think so.

"The Court: I wouldn't think so, either. . . . Here, I do not think that the jury had to engage in speculation. The state limited its information, redrafted it to comply with what I thought was the legitimate claim by the defense of a lack of evidence on the one half of the statute that was charged and proceeded on the other section of the statute.

"I believe there was sufficient evidence that did not require the jury to speculate to reach [the] conclusion which it reached, and, parenthetically, it's the second jury to reach the conclusion about the nature of the robbery at that hotel a few years ago." Evidence of the defendant's prior conviction was not before the jury. See footnote 1.

construction most favorable to sustaining the jury's verdict. . . . It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . . the jury [reasonably could] have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Citation omitted; internal quotation marks omitted.) *State* v. *Hamlett*, 105 Conn. App. 862, 866, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

On the basis of our review of the evidence, the arguments of the parties and the court's instructions, we conclude that the court did not improperly deny the defendant's motion for a judgment of acquittal on the basis of insufficient evidence. The defendant conceded that she had made a claim and had received workers' compensation benefits. She argues, however, that the state presented no evidence that she misrepresented a material fact or withheld such information when making her claim. The state, the defendant argues, failed to put into evidence the subject workers' compensation claim form or the statement she gave to the claims adjuster.[15] Why the state failed to offer such evidence is not in the record.

___

[15] As the court properly instructed the jury, "the state of Connecticut has the burden of proving this, [the] burden of proving all of the elements that the [court] is going to tell you that they have to prove. The defense doesn't have to prove [the defendant's] innocence." In this case, the state was required to prove a negative. The fact that the state must prove its case beyond a reasonable doubt does not, however, preclude the defendant from presenting admissible evidence that may defeat the state's case.

We conclude that the jury reasonably could have found, on the basis of inferences drawn from the evidence presented, that the defendant staged the robbery and failed to disclose that circumstance when she claimed to have been injured on March 4, 2002. As the court stated in its charge with respect to inference, "[o]rdinarily, knowledge can be established only through an inference from other proven facts and circumstances. The inference may be drawn if the circumstances are such that a reasonable person of honest intention in the situation of the defendant would have concluded that the statement was false. The determinative question is whether the circumstances of the particular case form a basis for a sound inference as to the knowledge of the accused in the transaction under inquiry. Material fact means an important or essential fact relating in this case to the claimed benefits, including but not limited to the existence, time, place, date, location, *circumstances* or symptoms of the claimed injury or illness." (Emphasis added.) It was the jury's right to infer that no workers' compensation benefits would have been paid to the defendant if she had disclosed that she had participated in the staged robbery of the hotel.[16] The defendant's claim therefore fails.

## II

The defendant's second claim is that the court improperly denied her motion for a mistrial made in response to testimony that the defendant had invoked her constitutional right to counsel.[17] The state argues

---

[16] The state also argues that the jury reasonably could have found that the defendant was not injured during the robbery. We decline to analyze this argument, as it was not the basis on which the court denied the defendant's motion for a judgment of acquittal.

[17] The defendant does not claim that she was in custody at the time she invoked her right to counsel or that she had been advised of her right to remain silent pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Evidence of a defendant's postarrest silence is a violation of the defendant's state and federal constitutional rights. See *Doyle* v. *Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State*

that the court properly denied the motion for a mistrial because defense counsel invited the testimony and that the defendant was not prejudiced because the court struck the testimony and gave the jury a curative instruction. We agree with the state.

The following facts are related to the defendant's claim. During defense counsel's cross-examination of Lopez, a portion of counsel's inquiry focused on the events of June 10, 2002, at the defendant's home:

"Q. And at that point, is it fair to say you no longer considered her a victim but you thought she was a suspect with some involvement in staging this robbery. Is that fair to say?

"A. Yes, sir.

"Q. [I]s it fair to say you were going there to interrogate her that day?

"A. I was going there to interview her. She was not in custody.

"Q. Okay. She was not in custody, of course, but you went with another detective?

"A. Yup.

"Q. Showed up unannounced at her home after you had received information about the case . . . but you're saying you weren't interrogating her?

"A. No, sir. I was simply making inquiries about what happened that day.

"Q. Did you have her sign a written statement about what she told you?

v. *Ferrone*, 97 Conn. 258, 266, 116 A. 336 (1922). The defendant concedes that evidence of a defendant's prearrest silence is not inadmissible on the same constitutional grounds; see *State* v. *Leecan*, 198 Conn. 517, 521–23, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); but she has raised the claim for purposes of further appeal.

"A. No, sir.

"Q. Okay. Did you record her comments on a tape recorder or anything like that?

"A. No, sir.

"Q. Did you write a report specifically about that incident?

"A. I don't believe I did. *She requested counsel at that point.*

"Q. Okay.

"A. She refused to talk to me after that meeting.

"Q. Okay. Now, you certainly in your years of being a Hartford detective, you get a lot of experience in interviewing witnesses, witnesses and victims and suspects. Is that fair to say?

"A. True.

"Q. And probably had training on how to do that on top of experience. Right?

"A. Yes, sir.

"Q. And once you had talked to [the defendant] that day, June 10, based on information she gave you, you were able to wrap up your investigation soon afterward. Is that fair to say?" (Emphasis added.)

During redirect examination, defense counsel objected to unrelated questions posed by the prosecutor, and the court excused the jury. After the issue was resolved, the court stated to defense counsel: "[Lopez] mentioned that your client asked to call counsel. You did not ask that that be stricken. I was going to bring that up after this witness has finished his testimony or outside of the presence of the jury, but they're gone at the moment, and I don't know if you want to try to do anything about that . . . ." After consulting with

cocounsel, defense counsel moved to strike Lopez' answer that the defendant asked to speak with counsel. After Lopez' testimony was read back, defense counsel made an oral motion for a mistrial, arguing that it was improper for Lopez to comment on the defendant's invoking her constitutional right to remain silent. Moreover, Lopez' answer was nonresponsive.

The court noted that the answer "was sort of responsive. The general line of questioning was attempting . . . to show that the investigation was inadequate, the report writing was inadequate or the statement having been taken from the defendant." The court invited defense counsel to inform it if the court had misinterpreted counsel's motive. The court denied the motion for a mistrial and instructed the jury to disregard Lopez' comment regarding the defendant's request for counsel.[18] Neither counsel mentioned the stricken testimony during final arguments, and the court, in its general instructions, admonished the jury to disregard any testimony that had been stricken.

On appeal, the defendant claims that the state introduced the evidence in violation of her state and federal constitutional rights. The record and the court's finding are to the contrary. At the time the court was considering the motion for a mistrial, it stated to defense counsel: "I'm talking about walking up to a big sign like this. It says area mined; enter at your own risk. And you leaped the fence and went tiptoeing through the mine field, and there's certain dangers in that, okay. . . .

---

[18] The court instructed the jury: "Now, on cross-examination the detective answered a question concerning the interview with the defendant on June 10, I believe, at her home, but your recollection of the evidence controls. To some extent, one of his answers was not responsive, and I am going to strike that, in addition to something you couldn't consider because of the rights we all enjoy. And one of those rights we all enjoy and we all possess by being in this country is the right to counsel. So, any comment about the invocation of the right to counsel was not responsive and is not to be considered by you in any way, shape or form."

"Now, the defendant did not invoke the constitution in a custodial interrogation. You did not establish that. . . . There is no information that the state is behind this testimony. So, stop me whenever you think I'm wrong. And you did, on a couple of occasions, mention why there was no statement from your client.[19] It's not just one question. That may be the issue on whether or not an answer was responsive, but on the issue of inviting comment, opening the door, failure to have completely clean hands, that's a different matter."

"Although the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial [court] is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The decision whether to grant a mistrial is within the

---

[19] Earlier in his cross-examination of Lopez, defense counsel conducted the following inquiry:

"Q. Was there some reason you didn't meet with her to take a written statement after what transpired?

"A. With the phone call?

"Q. Following the phone call.

"A. Well, there was a point in time when I did try to meet with her with a written statement.

"Q. I am talking about March 8 at this point again.

"A. Well, I felt there should be some more information and more facts known.

"Q. Okay. But at least at that point she didn't say to you I am not going to give you a statement?

"A. Not at that point.

"Q. She didn't refuse. And isn't it true that you never did take a statement from [the defendant]?

"A. No, I did not."

sound discretion of the trial court. . . . [T]he defendant bears the burden of establishing that there was irreparable prejudice to the defendant's case such that it denied him a fair trial." (Internal quotation marks omitted.) *State* v. *Messam*, 108 Conn. App. 744, 756–57, 949 A.2d 1246 (2008).

"Discretion involves a choice by a court to do or not to do something that one cannot demand as an absolute right. Courts exercise discretion in cases where impartial minds could hesitate, which exercise usually entails a balancing of the relative gravity of the factors involved. . . . An abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citation omitted.) *In re Shaquanna M.*, 61 Conn. App. 592, 603, 767 A.2d 155 (2001).

In this case, the court found that defense counsel invited Lopez to explain why he had failed to get a written statement from the defendant in an effort to disparage the investigation Lopez had conducted. "Action induced by an appellant cannot ordinarily be a ground of error. . . . When the claimed error is the result of a question posed by the defendant on cross-examination, [s]o long as the answer is clearly responsive to the question asked, the questioner may not later secure a reversal on the basis of any invited error." (Internal quotation marks omitted.) *State* v. *Messam*, supra, 108 Conn. App. 757–58. The court, here, noted that there may be a question as to whether Lopez gave a responsive answer to defense counsel's question, "Did you write a report specifically about that incident?" The court also found, however, that defense counsel had pressed for an explanation, as Lopez had testified several times that he did not obtain a statement from the defendant. Because defense counsel persisted in this

line of questioning, he opened the door for Lopez to explain why there was no statement.

A similar situation was at issue in *Messam*, in which defense counsel asked a witness, "[s]o, there is another report other than this one?" The witness answered, "[t]here [are] two [drug] buy reports." (Internal quotation marks omitted.) *State* v. *Messam*, supra, 108 Conn. App. 754. Defense counsel immediately asked that the jury be excused and orally moved for a mistrial. Id. On appeal, the defendant argued that the question required only a yes or no answer. This court reasoned that defense counsel "had been given a yes answer already on the same question. Despite this, counsel continued to press [the witness] as to whether there were additional reports, knowing that there were a total of three reports, two of which related to the controlled [drug] buys. Counsel's repeated questions opened the door to [the witness'] answer, which was responsive to the question." Id., 758.

Finally, the defendant here has not demonstrated that she was denied a fair trial. See id., 757. As in *Messam*, the court struck Lopez' answer and gave a curative instruction, telling the jury to disregard it. "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." Id., 758. "Such curative instructions are entitled to great weight and ordinarily prevent an appellate court from finding that [there was] reversible error." (Internal quotation marks omitted.) *State* v. *Youdin*, 38 Conn. App. 85, 94, 659 A.2d 728, cert. denied, 234 Conn. 920, 661 A.2d 100 (1995). Moreover, there was substantial circumstantial evidence against the defendant. The court aptly observed that "a detective in the case thinks this defendant is guilty is not new to anybody, even fledgling jurors."

For the foregoing reasons, the defendant's claim that the court improperly denied her motion for a mistrial cannot succeed.

## III

The defendant's third claim is that the court improperly instructed the jury on the element of material fact in § 31-290c (a) (2).[20] In her brief, the defendant acknowledges that this claim was not raised at trial and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). On the basis of our review of the briefs and the record, we conclude that the defendant not only failed to raise the claim at trial but also that she waived it. Under those circumstances, the claim is not reviewable. See *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007) ("*Golding* review is inapplicable to an unpreserved claim of induced error").[21]

The defendant claims that the court improperly charged that "[m]aterial fact means an important or essential fact relating in this case to the claimed benefits, including but not limited to the existence, time, place, date, location, circumstances or symptoms of the claimed injury or illness." In her brief, the defendant argues that the court broadened the material fact element of the charged offense if the facts omitted from her claim for workers' compensation benefits "were

---

[20] The portion of the defendant's brief concerning this claim commences with a concession that materiality is a question of law for the court to determine, not a question of fact for the jury. She raises the claim for the sake of future review.

[21] "Although our Supreme Court decided *Fabricatore* pursuant to a *Golding* analysis, an argument has been made that a waiver analysis should be applied when an appellant waives a constitutional right to a trial but attempts to undo the waiver by asserting a constitutional claim on appeal and requesting *Golding* review. See *State* v. *Arluk*, [75 Conn. App. 181, 192, 815 A.2d 694 (2003)] (*Landau, J.*, concurring). Although the *Fabricatore* court relied, in part, on *Arluk*, it did not distinguish a *Golding* analysis from a waiver analysis, although it implied that a waiver analysis equally would be valid by noting that a change in strategies would amount to induced error. See *State* v. *Fabricatore*, supra, 281 Conn. 480–81." *State* v. *McDaniel*, 104 Conn. App. 627, 635 n.6, 934 A.2d 847 (2007), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008).

merely important," rather than making a difference in the outcome of the case. Even a cursory review of this claim informs us that, by focusing on one word of the court's charge—the word "important"—the defendant has not presented her claim within the well known standard that a jury charge is to be read as a whole, within the context of the trial and not in a vacuum. See *State* v. *Davis*, 255 Conn. 782, 794–96, 772 A.2d 559 (2001).[22]

"[W]aiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) *State* v. *Corona*, 69 Conn. App. 267, 274–75, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002). In preparing its charge to the jury, the court presented counsel with three drafts of it for comment and objection. The defendant withdrew her request to charge and agreed to the charge that the court intended to give.[23] We therefore conclude that the defendant waived any challenge to the court's instruction and decline to discuss the claim further.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[22] We also note that during his final argument to the jury, defense counsel stated: "So, the state has to prove that she didn't disclose something. The state has to prove that she, that it was an important thing, a material thing, and [it has] to prove that she didn't disclose it on purpose."

[23] The following colloquy transpired between defense counsel and the court:

"The Court: Did [counsel] read the third edition or third draft of the instruction?

"[Defense Counsel]: Yes, Your Honor.

"The Court: Any problems with that?

"[Defense Counsel]: Just a typo concerning the $2000 versus the $5000 issue.

\* \* \*

"The Court: Okay. Is there anything else about the instruction other than fixing the numbers?

"[Defense Counsel]: No, Your Honor."