STATE OF CONNECTICUT *v.* NOEL ACOSTA, JR.
(AC 29954)

Flynn, C. J., and Lavine and West, Js.

Argued November 16, 2009—officially released February 2, 2010

*Norman A. Pattis*, with whom, on the brief, was *John F. Geida*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Kevin C. Doyle*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Noel Acosta, Jr., appeals from the judgment of conviction, rendered after a jury trial, of one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2).[1] On

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

appeal, the defendant claims that (1) the trial court improperly denied his motion to suppress a statement he made to the police, (2) the court improperly denied his *Batson*[2] challenge during jury selection and (3) the jury's verdict finding him guilty of robbery is inconsistent with the jury's verdict finding him not guilty of charges of burglary in the first degree in violation of General Statutes (Rev. to 2007) § 53a-101 (a) (1), and conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-101 (a) (1). We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 4, 2007, at approximately 5:20 a.m., Mario Olivar was awakened by the sound of his doorbell at his residence, a second floor apartment located at 95 Lombard Street in New Haven. Olivar opened the front door and saw two men: Pedro Rosario[3] and the defendant. Rosario pointed a pistol at Olivar's head and entered the living room of the apartment while the defendant, who wore a black mask that covered his entire face except for his eyes, stood by the door. Rosario demanded Olivar's money. Olivar responded that he had none, and Rosario ordered Olivar to lie on the floor.

General Statutes § 53a-133 defines the crime of robbery as follows: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[2] See *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[3] Rosario also was referred to during the proceedings as Pedro Rosario-Gonzalez.

Olivar then told Rosario that he had money in his wallet, which was in his bedroom. Rosario took Olivar to the bedroom, while the defendant told Olivar's son, Vincenzio Olivar (Vincenzio), who also was in the living room along with Olivar's nephew, to remain seated. In the bedroom, Olivar gave Rosario the contents of his wallet, and Rosario demanded the gold chain that Olivar was wearing around his neck.

Rosario and Olivar returned to the living room, and Rosario renewed his demand for money. Olivar responded that he had no more money, and Rosario struck him on the head with his pistol. Rosario threatened Vincenzio, telling him that he was going to kill him and that he had killed before. Vincenzio subsequently gave Rosario his wallet, which contained $250. Rosario told the defendant that they should leave. The defendant exited the apartment but returned immediately saying that the police had arrived. As Rosario and the defendant left the apartment, Vicenzio hit the defendant with a bottle of beer, and Olivar threw a case of beer at the defendant, striking him in the head.

Officers Philip McKnight and Lisa Wexler of the New Haven police department responded to a 911 call from the apartment, arriving at the scene at about the time Rosario and the defendant were attempting to leave. The officers had little information, knowing only that an apparent burglary by two male suspects was taking place at the address. The scene encountered by the officers was chaotic; Rosario and the defendant were descending the staircase to the apartment, and a group of men at the top of the stairs was yelling and throwing items, including beer bottles and a television set. One of the men pointed at the defendant and yelled, "pistola."[4] Rosario jumped from the staircase leading to the apartment in an attempt to flee. McKnight stopped Rosario

---

[4] "Pistola" is Spanish for "pistol" or "handgun."

and was able to handcuff him, while Wexler held the defendant at gunpoint.

The officers handcuffed the defendant, and Wexler searched him for weapons, finding two firearms. The defendant told Wexler that he had a permit for the firearms. Wexler and McKnight noticed that the defendant, who was lying face down on the sidewalk adjacent to the apartment, was bleeding from the head. The officers also saw that the defendant wore a gold department of correction badge on a chain around his neck. McKnight asked the defendant if he worked for the department of correction, and the defendant responded that he was a counselor there. In fact, the defendant was not an employee of the department of correction. The defendant thereafter was arrested and charged with one count of robbery in the first degree, one count of burglary in the first degree and one count of conspiracy to commit burglary in the first degree.

At trial, the defendant testified that on the morning of the robbery, he and Rosario had gone to Olivar's apartment to purchase beer after spending the preceding evening drinking. The defendant testified that Rosario pulled a gun on Olivar in a dispute over payment. The defendant recognized the weapon as his own, eventually wrestling it away from Rosario and putting it into his pocket. As to the department of correction badge, the defendant testified that he had borrowed it from his aunt, Stephanie Lozada, who worked for the University of Connecticut Health Center located at the New Haven Correctional Center. The defendant explained that he wanted the badge as a "good luck charm" when he took an examination to qualify as a department of correction employee.

Following trial, the jury found the defendant guilty of the robbery charge and not guilty of the burglary and conspiracy to commit burglary charges. The court

denied the defendant's motions for a judgment of acquittal and for a new trial. The defendant thereafter was sentenced to a term of twenty years imprisonment, execution suspended after twelve years, with a five year term of probation. The present appeal followed. Additional facts will be provided where necessary.

I

The defendant first challenges the court's denial of his motion to suppress his statement, given to McKnight, that he worked for the department of correction. Specifically, the defendant argues that the court improperly failed to determine that the statement was a product of his custodial interrogation by McKnight and therefore should have been suppressed because it occurred prior to the defendant's having been advised of his *Miranda*[5] rights. We disagree.

The following facts pertain to the defendant's claim. Prior to trial, the court held a hearing on the defendant's motion to suppress the statement, during which the sole witness was McKnight, who testified as follows. At approximately 5:30 a.m. on the morning in question, McKnight responded to a call of a possible home burglary by two male suspects at 95 Lombard Street in New Haven. Wexler already was present when McKnight arrived. As he approached, McKnight saw a group of men on the porch at the top of the stairway to the apartment shouting and pointing at two men coming down the stairs. McKnight handcuffed Rosario, who had leapt from the staircase in an attempt to flee, and proceeded to assist Wexler, who was with the defendant.

McKnight pulled the defendant away from the stairway and noticed that the defendant was bleeding from

---

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the head. After the defendant had been handcuffed and Wexler had searched him for weapons, McKnight noticed the gold department of correction badge hanging from a chain around the defendant's neck. The sight of the badge surprised McKnight, who determined that the defendant probably was a department of correction employee. McKnight asked the defendant whether he worked for the department of correction, and the defendant responded that he was a counselor there. At this point, neither McKnight nor Wexler had provided the defendant with *Miranda* warnings. McKnight eventually seized the badge as potential evidence. Only a few minutes had elapsed from the time McKnight arrived on the scene to the time he questioned the defendant.

At the hearing on the motion to suppress, the state conceded that the defendant was in custody at the time McKnight questioned him. Following McKnight's testimony, the court denied the defendant's motion. The court found that at the time he questioned the defendant, McKnight did not know fully what had happened, as the chaotic events had unfolded rapidly. The court also credited McKnight's testimony that he was surprised to see the department of correction badge. The court concluded that the question was a preliminary inquiry and did not constitute interrogation under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We begin with the applicable standard of review. It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id., 444. Our review is guided by the fact that resolution of the defendant's motion to suppress required the court to determine whether the defendant

was subjected to interrogation. "[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." *State* v. *Mullins*, 288 Conn. 345, 364, 952 A.2d 784 (2008).

Under *Miranda*, the definition of interrogation is not limited to express questioning by the police but includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *reasonably likely to elicit an incriminating response from the suspect.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 588, 916 A.2d 767 (2007). However, as this court has stated, "[e]very question posed to a defendant in custody is not equivalent to an interrogation." *State* v. *Dixon*, 25 Conn. App. 3, 8, 592 A.2d 406 (1991).

Our review of the record leads us to conclude that the court properly determined that McKnight's question to the defendant did not constitute interrogation. The record reflects the chaotic scene that McKnight and Wexler encountered upon their arrival at the address in the early morning hours. A group of men were on the porch and staircase to the apartment. Some of these men were shouting and pointing at others. One was leaping from the staircase in an attempt to flee. Beer bottles and a television set were being thrown from the porch. One man was bleeding from the head. All of this occurred within the span of a few minutes. Further, McKnight and Wexler possessed scarce information prior to arriving: a call was made from the apartment indicating that a burglary was taking place and that two men were involved. Given this situation, and the prompt arrival of the police during the resulting melee,

McKnight's question to the defendant concerning the department of correction badge and possible employment by the department cannot be categorized as being "reasonably likely to elicit an incriminating response from the suspect." (Internal quotation marks omitted.) *State* v. *Canales*, supra, 281 Conn. 588. Rather, the question was a part of the officer's initial inquiry into the situation, an effort to assess the circumstances and determine who present, if anyone, was involved in the reported burglary.

Upon arriving at the scene, McKnight knew only that a burglary involving two male suspects had been reported. Facing the defendant under the circumstances, even after the defendant had been handcuffed, McKnight could not have been sure that the defendant was one of those suspects. Certainly, given the nature of the events that occurred in the brief span in question, there was a chance that the defendant had not been involved and, therefore, had been handcuffed improperly and taken into custody. The question posed by McKnight must be viewed in the context of the events as they unfolded. We conclude that the court properly denied the defendant's motion to suppress his statement, as McKnight's question did not constitute interrogation for the purposes of *Miranda*.

## II

The defendant next claims that the court improperly denied his *Batson* challenge during jury selection. He argues that the court incorrectly determined that the state had put forth a race neutral reason for exercising a peremptory challenge to remove an African-American woman from the jury pool. We are not persuaded.

The following facts, taken from the record, are relevant to the defendant's claim. During jury selection,

defense counsel questioned the venireperson, N,[6] an African-American woman, about her previous experiences with the criminal justice system. Responding to defense counsel's inquiries, N indicated that her probation period had ended in 2002, that she had been treated fairly by the prosecutor and by the public defender who had represented her, and that the police officers involved had "treated [her] normal." N further stated that her brother had been the victim of an unsolved shooting and robbery but that this fact would not affect her ability to be fair and objective as a juror.

During the prosecutor's examination, N revealed that she previously had been arrested in New Haven, the city in which the defendant's trial was being held, for possession of marijuana. N also related that her brother had been shot and robbed in New Haven. The prosecutor asked N about her understanding of the standard of proof in a criminal case. N stated: "I might want to be 100 percent [certain] . . . because I don't want to like give a verdict out and not be 100 percent" and indicated that it would be hard for her to put this tendency aside. Upon further questioning, N stated that she would be able to follow the judge's instructions regarding the standard of reasonable doubt.

At the close of questioning, the prosecutor asked that N be excused from the jury panel. The prosecutor cited N's previous arrest and prosecution in New Haven, the fact that her brother had been a victim of an unsolved crime and her statements about wanting "100 percent" certainty in arriving at a decision as race neutral reasons for the exclusion. Defense counsel objected, offering a *Batson* challenge. The court denied the defendant's *Batson* motion, holding that N's previous prosecution and her equivocal response with regard to her requiring

---

[6] We refer to the juror by initial to protect her legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

absolute certainty in reaching a conclusion while asserting that she would follow the court's instructions constituted race neutral reasons for the prosecutor's use of the peremptory challenge. The court noted that it had made its own observations of N during questioning about the proper burden of proof, stating that there was "certainly enough in her demeanor and in her answers on that point in and of itself to justify the exercise of a peremptory in this case."

On appeal, the defendant claims that neither reason cited by the court in making its ruling was proper. He denominates the reason pertaining to N's previous prosecution a "red herring" "because the prospective juror admitted that she was treated fairly, held no animosity and realized that her involvement with the criminal justice system bore no relationship to the case of [the defendant]." He further contends that the second reason, N's statements indicating that she might have required absolute certainty to make a decision, was not sufficient because the prosecutor conceded that N had stated that she would follow the law as instructed by the court. We cannot agree with the defendant.

The principles of law and standard of review applicable to this claim are well established. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids [a party] to challenge potential jurors solely on

account of their race . . . ." (Internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 408, 886 A.2d 404 (2005).

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"[T]he trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id., 408–10.

Following our review of the record in the present case, we cannot say that the court's denial of the defendant's *Batson* challenge was improper. Questioning of N by both defense counsel and the prosecutor revealed

the fact that she previously had been arrested and prosecuted for possession of marijuana in New Haven where this prosecution was to occur. Under the case law precedent of our Supreme Court, this reason alone was a constitutionally acceptable ground for her excusal. "[A]n arrest record . . . constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). As to the second reason offered by the prosecutor, although N ultimately stated that she would be able to follow the court's instructions, and the prosecutor acknowledged this statement, in such instances "a prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). N's "equivocation with respect to holding the state to a higher burden of proof than proof beyond a reasonable doubt . . . [is a] valid, nondiscriminatory [reason] for excusing her." Id., 232. We conclude that the defendant has not met his burden of demonstrating that the court's rejection of his *Batson* challenge was clearly erroneous.

### III

The defendant's final claim is that the jury's verdict finding him guilty of robbery in the first degree is not consistent with its finding him not guilty of burglary in the first degree and conspiracy to commit burglary in the first degree. He argues that the facts demonstrated that the robbery was committed inside the residence and, therefore, was classified properly as a burglary. He contends that the "verdicts are not logically and reasonably consistent" and that they require this court to remand the case for a new trial on the robbery charge. The state argues in opposition that the defendant's

claim is foreclosed by our Supreme Court's recent decision in *State* v. *Arroyo*, 292 Conn. 558, 973 A.2d 1254 (2009). We agree with the state.

In *Arroyo*, the Supreme Court affirmed its holdings in *State* v. *Whiteside*, 148 Conn. 208, 169 A.2d 260, cert. denied, 368 U.S. 830, 82 S. Ct. 52, 7 L. Ed. 2d 33 (1961), and *State* v. *Rosado*, 178 Conn. 704, 425 A.2d 108 (1979), "that factually and logically inconsistent verdicts are permissible." *State* v. *Arroyo*, supra, 292 Conn. 583. The *Arroyo* court also held that legally inconsistent verdicts are permissible and, thus, not reviewable, adopting the rule of *United States* v. *Powell*, 469 U.S. 57, 69, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984). *State* v. *Arroyo*, supra, 585. On the basis of this controlling precedent, we reject the defendant's final claim.

The judgment is affirmed.

In this opinion the other judges concurred.