******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# HUDEL GAMBLE *v.* COMMISSIONER
# OF CORRECTION
## (AC 39971)

DiPentima, C. J., and Alvord and Pellegrino, Js.

*Syllabus*

The petitioner, who had been convicted of the crime of manslaughter in the first degree with a firearm as an accessory in connection with the shooting death of the victim from multiple gunshot wounds, sought a writ of habeas corpus, claiming that his appellate counsel provided ineffective assistance by failing to raise a claim of insufficient evidence on direct appeal. Specifically, the petitioner, who was part of a group of individuals, including R and S, who all fired shots at the victim, claimed that the evidence could only support his conviction of manslaughter as a principal and, thus, could not support his conviction of that charge as an accessory. His claim was based on the fact that R testified that the petitioner fired the rifle from which the fatal shot was fired. The habeas court rendered judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Held* that the habeas court properly concluded that the petitioner failed to prove that he was prejudiced by his appellate counsel's performance, as there was sufficient evidence that the petitioner acted in concert with R and S to achieve the intended result of the death of the victim, and, therefore, it was not reasonably probable that the petitioner would have prevailed on direct appeal on a sufficiency claim: under a concert of action theory, it is immaterial who fired the fatal shot and what is material is whether the evidence shows that the petitioner acted in concert with others to bring about the death of the victim, which the evidence here showed, and the fact that medical and ballistics evidence revealed that the fatal shot was fired from a certain rifle did not prevent application of the concert of action theory, as the jury reasonably could have been uncertain as to which individual fired the fatal shot and it did not need to make that determination to find the petitioner guilty of manslaughter under an accessorial theory of liability given that there is no meaningful distinction between principal and accessorial liability as a matter of law; moreover, contrary to the petitioner's claim, his acquittal of manslaughter as a principal and possession of an assault weapon did not preclude this court under the doctrine of collateral estoppel from examining the issue of whether he possessed or fired the rifle from which the fatal shot was fired, as that doctrine does not apply to a review of the sufficiency of the evidence, and it was not for this court to review any inconsistencies among the verdicts in this case, which are permitted under the law.

Argued October 5, 2017—officially released January 23, 2018

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Sferrazza, J.*, rendered judgment denying the petition; thereafter, the court granted the petition for certification to appeal, and the petitioner appealed to this court. *Affirmed.*

*Jade N. Baldwin*, for the appellant (petitioner).

*Jo Anne Sulik*, supervisory assistant state's attorney, with whom, on the brief, were *Adrienne Russo*, assistant state's attorney, and *Patrick J. Griffin*, state's attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, Hudel Gamble, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly rejected his claim of ineffective assistance of appellate counsel. We are not persuaded by the petitioner's arguments, and, accordingly, affirm the judgment of the habeas court.

The following facts and procedural history are relevant to the resolution of the petitioner's appeal. On November 29, 2005, Daniel Smith was driving a borrowed BMW in New Haven while Ricardo Ramos was seated in the front passenger seat. The petitioner later joined Ramos and Smith, and sat in the back seat. The petitioner, Ramos, and Smith proceeded to joyride around the "Hill" section of New Haven[1] while smoking marijuana. At that time, both the petitioner, who was seventeen years old, and Ramos, who was fifteen years old, were residents of the "Hill" section of New Haven. Ramos had known the petitioner and Smith for two to three years and would see both the petitioner and Smith on a daily basis.

At some point, Smith drove into the "Tre" section of New Haven.[2] Ramos noticed an acquaintance of his on Kensington Street, and Smith stopped the BMW. The woman stated in a loud voice that a man with whom Ramos had a "beef" was in the area. Smith drove around the block and upon returning to Kensington Street, Ramos spotted the victim, whom he believed had killed his cousin in the "Hill" section over a month earlier.

The victim was with a group of four or five individuals who were standing to the right of the BMW. Someone from the group fired shots at the BMW. The petitioner, Ramos, and Smith all returned fire. The victim sustained five gunshot wounds due to the entry, exit, and reentry of bullets, and ultimately died. The medical examiner recovered three different types of bullets from the victim's body. Ballistics evidence revealed that one of the three bullets recovered from the victim's body was damaged, but that it had the characteristics of a .22 long rifle caliber bullet. Ballistics testing of the damaged bullet revealed that it could have been fired from various handguns, revolvers, semi-automatic pistols, and several types of long arms. This bullet entered the victim's right knee. A .38 caliber bullet, which ballistics testing revealed could have been fired from either a .38 revolver or a .357 magnum caliber revolver, entered the victim's right hip. A .30 caliber bullet, which ballistics testing established was fired from an SKS semiautomatic rifle that the police found under Ramos' bed following the shooting, traveled through the victim's right arm, reentered the right side of his chest, went through his right lung and grazed his diaphragm and liver. The official cause of the victim's death was from multiple

gunshot wounds. The medical examiner testified that the victim's injuries to his knee and hip were treatable, but that the medical personnel were unable to treat successfully the victim's chest injury. The day after the shooting, Ramos learned that the victim was unknown to him and was not the individual with whom he had a "beef." The police did not find any latent fingerprints on the SKS rifle or its magazine.

The jury found the petitioner guilty of manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-55 (a) (3) and 53a-8. The petitioner was also charged with, and found not guilty of, manslaughter in the first degree with a firearm in violation of § 53a-55 (a) (3), murder and murder as an accessory in violation of General Statutes §§ 53a-54a and 53a-8, conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a), possession of an assault weapon in violation of General Statutes §§ 53-202c and 53a-8, and conspiracy to possess an assault weapon in violation of §§ 53-202c and 53a-48 (a). The court, *Holden, J.*, sentenced the petitioner to thirty-seven and one-half years incarceration.

The petitioner, represented by Attorney William Westcott, unsuccessfully appealed his conviction.[3] See *State* v. *Gamble*, 119 Conn. App. 287, 987 A.2d 1049, cert. denied, 295 Conn. 915, 990 A.2d 867 (2010).

On August 25, 2016, the petitioner filed a third amended petition for a writ of habeas corpus, alleging the ineffective assistance of appellate counsel.[4] He alleged that his appellate counsel provided ineffective assistance by failing to raise a claim of insufficient evidence on direct appeal.

At the habeas trial, Westcott testified that he did not raise a sufficiency claim on direct appeal because he had not prevailed on a similar claim in a different appeal in which a defendant, who was convicted as an accessory, was part of a group of individuals who all fired shots at the victim, who they were "out to get." Attorney Daniel Krisch testified for the petitioner as an expert in appellate practice. He testified that the only evidence of the petitioner's aiding the principal was that he had handed Ramos a .22 caliber pistol which had caused the treatable injury to the victim's knee. He further testified that no reasonable jury could have convicted the petitioner of manslaughter as an accessory, and there was a reasonable probability that an insufficiency claim would have been successful on direct appeal.

On November 28, 2016, the habeas court, *Sferrazza, J.*, issued a memorandum of decision denying the petition for a writ of habeas corpus. The court stated that "[w]here multiple shooters intentionally fire at someone, all the shooters can properly be convicted, through accessorial liability, of the homicide even though it was a companion's bullet that killed the victim. *State* v.

*Delgado*, 247 Conn. 616, 627, [725 A.2d 306] (1999). Such a show of force aids the killer by eliminating or reducing methods of escape, by deterring others from attempting to assist the victim, and by thwarting detection through the confusion generated by such a fusillade." The court concluded that the petitioner could not prevail on his claim because he failed to prove prejudice under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The court granted the petition for certification to appeal. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the petitioner claims that the habeas court improperly concluded that he failed to establish that his appellate counsel was ineffective by not raising insufficiency of evidence as an issue in his direct appeal. He contends that the court improperly concluded that he failed to prove that he was prejudiced by his appellate counsel's performance. We disagree.

We begin by setting forth our standard of review and the legal principles applicable to the petitioner's appeal. "Although a habeas court's findings of fact are reviewed under the clearly erroneous standard of review . . . [w]hether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 706, 23 A.3d 682 (2011).

"In *Strickland* v. *Washington*, [supra, 466 U.S. 687], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense [by establishing a reasonable probability that, but for the counsel's mistakes, the result of the proceeding would have been different]. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Parrott* v. *Commissioner of Correction*, 107 Conn. App. 234, 236, 944 A.2d 437, cert. denied, 288 Conn. 912, 954 A.2d 184 (2008). With respect to the prejudice prong, "we must assess whether there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed [on] . . . appeal, i.e., [obtaining] reversal of his conviction or granting of a new trial." *Small* v. *Commissioner of Correction*, 286 Conn. 707, 722, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "[T]he task before us is not to conclude definitively whether

the petitioner, on appeal, would have prevailed on his claim . . . . Rather, the task before us is to determine, under *Strickland*, whether there is a reasonable probability that the petitioner would have prevailed on appeal." (Emphasis omitted.) Id., 731. "To ascertain whether the petitioner can demonstrate such a probability, we must consider the merits of the underlying claim." Id., 728.

Underlying the petitioner's claim of ineffectiveness by appellate counsel is that there was insufficient evidence to support the petitioner's conviction of manslaughter in the first degree with a firearm as an accessory. "In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Abraham*, 64 Conn. App. 384, 400, 780 A.2d 223, cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001).

"A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." General Statutes § 53a-8 (a). This court has explained accessorial liability as follows: "To be guilty as an accessory, one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . . Whether a person who is present at the commission of a crime aids or abets its commission depends on the circumstances surrounding his presence there and his conduct while there. . . .

"Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the [conviction] must stand." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 135 Conn. App. 101, 107–108, 41 A.3d 340 (2012), aff'd, 311 Conn. 408, 87 A.3d 1101 (2014). "[A]ccessorial liability is predicated upon the actor's state of mind at the time of his actions, and whether that state of mind is commensurate to the state of mind required for the commission of the offense." *State* v. *Foster*, 202 Conn. 520, 532, 522 A.2d 277 (1987).

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." Accordingly, to be guilty of manslaughter as an accessory under this subsection, the petitioner must recklessly engage in conduct which created a grave risk of death to another and intentionally aid in the death of the victim.

At the center of the petitioner's claim on appeal is the testimony of Ramos, a key witness for the state, and the only person who was in the BMW at the time of the shooting who testified.[5] Ramos testified that the petitioner had given him a loaded .22 caliber pistol earlier on the day of the shooting when the two had met on the street. According to Ramos' testimony, Ramos fired a .22 caliber pistol two or three times, Smith reached across Ramos and fired a .357 caliber gun two or three times out of the open passenger side window and the petitioner fired shots from an SKS rifle while it rested on the open backdoor window of the BMW.

The petitioner claims that he was prejudiced by his appellate counsel's failure to raise a sufficiency claim because the evidence was insufficient to convict him of manslaughter under an accessorial theory of liability. Specifically, he argues that because Ramos testified that the petitioner fired the SKS rifle from which the fatal shot was fired, the evidence could only support conviction of manslaughter as a principal and could not support his conviction under an accessorial theory of liability. He further argues that the only evidence that he acted as an accessory was Ramos' testimony that the petitioner had handed Ramos a loaded .22 pistol prior to the shooting.[6] That event, the petitioner argues, could not establish the element of aiding in the victim's death because the .22 caliber bullet caused a nonfatal knee injury. He further argues that the evidence was insufficient to support his conviction because he was acquitted on the other charges and, in so arguing, raises the issue of collateral estoppel.[7]

The petitioner's arguments are unavailing. Ramos' testimony that the petitioner handed him a loaded .22 caliber pistol is not, as the petitioner argues, the only evidence supporting an accessorial theory of liability. In examining the underlying claim, we conclude that there was sufficient evidence to support his conviction of manslaughter as an accessory under a concert of action theory. Under a concert of action theory, it is immaterial who fired the fatal shot; what is material is whether the evidence shows that the petitioner acted with others to bring about the death of the victim. "[A] showing of concert of action between a defendant and

[others] can provide a sufficient basis for accessorial liability." *State* v. *Ashe*, 74 Conn. App. 511, 518, 519, 812 A.2d 194 (evidence that defendant acted in concert with others with intent to kill rival gang members sufficient to support murder conviction under accessorial theory of liability), cert. denied, 262 Conn. 949, 817 A.2d 108 (2003); see also *State* v. *Diaz*, 237 Conn. 518, 544, 679 A.2d 902 (1996) ("Although the evidence did not clearly demonstrate which of the perpetrators actually fired the shot that fatally injured [the victim], the evidence did establish that the defendant and his companions together prepared and readied themselves for the ambush . . . [and] fir[ed] repeatedly into the vehicle with the intent to kill one or more of the passengers. . . . [Thus, the evidence] show[ed] sufficient concert of action between the defendant and his companion[s] to support . . . the accessory allegation . . . ." [Internal quotation marks omitted.]).

The evidence, when viewed in the light most favorable to sustaining the verdict, shows the following. The petitioner, Ramos, and Smith were joyriding together in the "Hill" section of New Haven. Smith drove to the "Tre" section of New Haven where a woman informed Ramos that the victim was in the area. Ramos believed that the victim had killed his cousin over a month earlier in the "Hill" section of New Haven. The three young men searched for the victim. Smith circled the block and Ramos spotted the victim on Kensington Street. A member of the victim's group fired shots at the BMW. The petitioner, Ramos, and Smith all fired shots at the victim. Medical and ballistics evidence revealed that the victim sustained gunshot wounds from three different caliber bullets which had been fired from three different model guns. The habeas court aptly stated: "Where multiple shooters intentionally fire at someone, all the shooters can properly be convicted, through accessorial liability, of the homicide . . . ."

The petitioner argues that the concert of action theory, as expressed in *State* v. *Delgado*, supra, 247 Conn. 622, is inapplicable to the present case. In *Delgado*, the victim was shot in the back of his leg and the back of his arm, and died from loss of blood due to the gunshot wounds. Id., 620. This court concluded that "[a]lthough the evidence did not reveal whether it was the defendant or [a fellow gang member] who had fired the shot that fatally injured the victim, the jury reasonably could have determined that there was sufficient concert of action between the defendant and [the fellow gang member] to support the accessory allegation." Id., 623. The petitioner argues that because there was no confusion in the present case that the fatal shot was fired from the SKS rifle, the concert of action theory could not support his conviction under an accessorial theory of liability. We are not persuaded.

The fact that medical and ballistics evidence revealed

that the fatal shot was fired from an SKS rifle does not prevent the application of the concert of action theory. The jury reasonably could have been uncertain as to which individual fired the fatal shot from the SKS rifle.[8] Moreover, the jury did not need to determine who fired the fatal shot in order to find the petitioner guilty of manslaughter under an accessorial theory of liability.[9]

The gravamen of the petitioner's argument is that the evidence supported a conviction of him as the principal and, therefore, the evidence was insufficient to support his conviction of manslaughter as an accessory. In *State v. Hamlett*, 105 Conn. App. 862, 867, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008), the defendant claimed that the trial court erred in denying his motion for acquittal on his conviction of assault in the first degree because the evidence showed that he was the principal shooter and, therefore, he could not be found guilty as a "mere" accessory. Id., 867. This court noted that it was reasonable that the jury was unable to determine who shot the victim and concluded that the evidence was sufficient to support a conviction of assault as a principal or accessory because the defendant and another man confronted the victim with guns and the victim suffered gunshot wounds. Id., 867–68. The court rejected the defendant's argument that evidence sufficient to convict the defendant as a principal would be insufficient to convict him under an accessorial theory of liability. Id., 869. The court concluded: "Connecticut long ago adopted the rule that there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility. . . . The modern approach is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . Connecticut has taken the same approach through General Statutes § 53a-8. . . . There is no meaningful distinction between principal and accessory liability; they are simply theories for proving criminal liability. Given that a defendant may be convicted as an accessory even though he was charged only as a principal . . . we reject his argument that evidence sufficient to convict a defendant as a principal would be insufficient for a conviction under the theory of accessory liability." (Citations omitted; internal quotation marks omitted.) Id., 868–69.

In this case, the jury expressed uncertainty as to principal and accessorial liability. The court instructed the jury on the manslaughter charge under both principal and accessorial theories of liability. The jury initially indicated on the verdict form that the petitioner was not guilty on all counts. The foreperson then explained that "something [was] wrong." The court informed the jury to communicate its concerns to the court via a note. The foreperson stated in a note that the jury had

reached a verdict on manslaughter as an accessory, and was waiting to hear the clerk read that charge. The court recalled the jury and the verdict was vacated and rerecorded. The court then divided the manslaughter charge into principal and accessorial liability. The jury found the petitioner not guilty of manslaughter as a principal and guilty of manslaughter as an accessory. The jury's concern and the court's resultant division of the manslaughter charge does not alter the longstanding principle expressed in *Hamlett* that, as a matter of law, there is no meaningful distinction between principal and accessorial liability. See id., 869. We conclude that there was sufficient evidence that the petitioner acted in concert with Ramos and Smith to achieve the intended result, the death of the victim.

The petitioner also argues that the evidence is insufficient to support his conviction of manslaughter as an accessory because the jury acquitted him of both manslaughter as a principal and possession of an assault weapon. The petitioner argues that because of his acquittals, this court is collaterally estopped from examining the issue of whether he possessed or fired the SKS rifle, which the legislature defines as an "assault weapon." See General Statutes § 53-202a et seq. The petitioner further argues that this court, when reviewing the sufficiency claim, likewise cannot examine whether he fired the .22 pistol or the .357 revolver because the court granted the petitioner's motion for acquittal as to the charge of carrying a pistol without a permit.[10]

The doctrine of collateral estoppel does not apply to a review of the sufficiency of the evidence. "[C]ollateral estoppel principles do not apply in a single trial to preclude a verdict of guilty on an offense which includes elements in common with an offense for which the jury has returned a verdict of not guilty." *State* v. *Ortiz*, 29 Conn. App. 825, 836 n.6, 618 A.2d 547 (1993). As a result, the petitioner's acquittals do not preclude this court from examining all the evidence presented at trial when analyzing a claim challenging the sufficiency of the evidence. See id.; see also *State* v. *Stevens*, 178 Conn. 649, 653–56, 425 A.2d 104 (1979) (jury verdict acquitting defendant of larceny does not bar conclusion on appeal that sufficient evidence existed to support conviction of conspiracy to commit larceny).

Furthermore, we cannot review any inconsistencies among the verdicts in this case. "In [*State* v. *Arroyo*, 292 Conn. 558, 583, 585–86, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010)] the Supreme Court affirmed its holdings in *State* v. *Whiteside*, 148 Conn. 208, 169 A.2d 260, cert. denied, 368 U.S. 830, 82 S. Ct. 52, 7 L. Ed. 2d 33 (1961), and *State* v. *Rosado*, 178 Conn. 704, 425 A.2d 108 (1979), that factually and logically inconsistent verdicts are permissible. . . . The *Arroyo* court also held that legally inconsistent verdicts are permissible and, thus,

not reviewable, adopting the rule of *United States* v. *Powell*, 469 U.S. 57, 69, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984)." (Citation omitted; internal quotation marks omitted.) *State* v. *Acosta*, 119 Conn. App. 174, 187, 988 A.2d 305, cert. denied, 295 Conn. 923, 991 A.2d 568 (2010). "The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise. . . . [I]nconsistency of the verdicts is immaterial. . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Citation omitted; internal quotation marks omitted.) *State* v. *Knight*, 266 Conn. 658, 670, 835 A.2d 47 (2003).

We conclude that it was not reasonably probable that the petitioner would have prevailed on direct appeal on a sufficiency claim and, therefore, the petitioner has not demonstrated that he was prejudiced by Westcott's failure to raise that claim on direct appeal. Accordingly, we conclude that the habeas court properly rejected the petitioner's claim of ineffective assistance of appellate counsel.[11]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] There was evidence at the petitioner's criminal trial that Stevens Street and nearby Congress Street, where, respectively, Ramos and the petitioner lived at the time, were both in the "Hill" section of New Haven.

[2] Ramos testified at the petitioner's criminal trial that Kensington Street was in the "Tre" section of New Haven, and that driving on Orchard Street was a common route used to travel from the "Hill" section to the "Tre" section.

[3] On direct appeal, Westcott claimed that the trial court improperly: "(1) accepted the jury's verdict finding [the petitioner] guilty of manslaughter in the first degree with a firearm under the theory of accessorial liability and not guilty of the same crime under the theory of principal liability, thereby (a) violating his right against double jeopardy, (b) resulting in his being convicted of the nonexistent crime of being an 'accessory,' (c) resulting in a legally inconsistent verdict and (d) returning a verdict in violation of the principles of collateral estoppel, and (2) suggested in its jury instructions that defense counsel had made an improper closing argument, thereby improperly highlighting the defendant's decision not to testify." *State* v. *Gamble*, supra, 119 Conn. App. 289.

[4] The petitioner also alleged ineffective assistance by his criminal trial counsel. After the habeas court denied his petition in its entirety, the petitioner filed an appeal challenging only the court's denial of his claim of ineffective assistance of appellate counsel.

[5] The petitioner did not testify at his criminal trial, and Smith invoked his right to remain silent pursuant to the fifth amendment to the United States constitution when the prosecutor called him as a witness.

[6] General Statutes § 53a-8 (b) provides: "A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

[7] The petitioner also argues that the habeas court erred in stating that the evidence at the petitioner's criminal trial supported a finding that the petitioner fired the SKS rifle from the same vehicle from which the fatal shot was fired "by another individual." He argues that this finding is internally inconsistent because the fatal shot was fired from the SKS rifle, and therefore the petitioner could not have both fired the SKS rifle and not have fired the

fatal shot. Although the evidence at the petitioner's criminal trial indicated that the fatal shot was fired from the SKS rifle, a finding as to which individual fired the fatal shot is not material to the legal conclusion in this case because accessorial liability is based on a concert of action theory. See *Seligson* v. *Brower*, 109 Conn. App. 749, 753 n.2, 952 A.2d 1274 (2008).

The petitioner also argues that during the criminal trial, the prosecutor relied on the theory that the petitioner was the principal actor in the manslaughter and that in this habeas proceeding, the respondent, the Commissioner of Correction, changed the state's theory of liability by presenting a new theory that the petitioner may not have been the principal actor. We disagree. The respondent did not depart from the state's theory of liability. First, during closing arguments, the prosecutor discussed the concepts of principal and accessorial liability and explained that one can be an accessory when he is part of a joint effort. Second, there is no meaningful distinction between principal and accessorial liability. See *State* v. *Hamlett*, 105 Conn. App. 862, 867, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

[8] The jury had for its consideration conflicting accounts as to who fired the SKS rifle. The petitioner's statement to police indicates that Ramos fired the SKS rifle. The petitioner indicated in his statement to police that he, Ramos, and Smith were joyriding in a BMW and that after a group fired guns at the BMW, Ramos returned fire using a black gun that was "at . . . best . . . an automatic." There was evidence that the SKS rifle was heavy and unwieldy; and defense counsel argued during closing argument that the petitioner was unable to maneuver the weapon. Ramos testified at trial that he did not see the petitioner with a firearm when he entered the BMW, and testified the petitioner fired the SKS rifle. Ramos conceded on cross-examination that he had given different versions of events to police and that he had informed police that the petitioner had fired the SKS rifle only after the police had found the SKS rifle under his bed. Ramos testified at trial that the petitioner and Smith told him to take the SKS rifle from the back seat of the BMW, and he grabbed it and put it under his bed. Ramos further testified that the petitioner and Smith dropped Ramos off following the shooting, circled around the block to Ramos' residence, and told Ramos to grab the SKS from the back seat of the BMW and that he grabbed it and placed it under his bed.

[9] The petitioner argues that no evidence existed that he shot any weapon other than the SKS rifle. The petitioner's statement to the police, if believed, indicated that Ramos fired the SKS rifle. Furthermore, the victim's injuries indicated that shots had been fired from three different types of firearms. Ed Beamon, a New Haven resident, testified that in the early evening of November 29, 2005, he was sitting on his neighbor's front porch on Kensington Street when he heard shots being fired, and he ran out to the victim and observed shots being fired from the front and rear passenger sides of a "maroon" car. The petitioner admitted in his statement to police that he was seated in the back seat of the BMW during the shooting. The jury reasonably could have inferred that the petitioner fired one of the three weapons.

[10] The petitioner's trial counsel argued before the trial court that the state presented no evidence that the petitioner did not have a permit and, therefore, the petitioner should be acquitted of the charge of carrying a pistol without a permit. The state agreed. The court found that there was no evidence supporting any of the elements of the charge.

[11] The petitioner further argues that the habeas court erred in failing to address the deficiency prong of *Strickland* and should have found that appellate counsel's performance was deficient. Because the habeas court properly determined that the petitioner had failed to prove prejudice, it was not required to address the performance prong. "Because both prongs of the *Strickland* test must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." *King* v. *Commissioner of Correction*, 73 Conn. App. 600, 602–603, 808 A.2d 1166 (2002), cert. denied, 262 Conn. 931, 815 A.2d 133 (2003).